Gabriel Leeb and Thelma Leeb, Husband and Wife v. Commissioner. Leighton Rosenthal and Honey Rosenthal, Husband and Wife v. Commissioner. Gabriel Feigenbaum and Miriam Feigenbaum, Husband and Wife v. Commissioner.
Leeb v. Commissioner
Docket Nos. 35019, 35020, 35038.
United States Tax Court
1953 Tax Ct. Memo LEXIS 343; 12 T.C.M. (CCH) 256; T.C.M. (RIA) 53073; March 12, 1953
*343 The gains derived by petitioners during the taxable year from the sale of certain properties are properly taxable as capital gains. Section 117 (a) and (j), I.R.C.
M. R. Schlesinger, Esq., 1720 N.B.C. Building, Cleveland, Ohio, for the petitioners. Charles R. Hembree, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion These proceedings involve deficiencies determined by respondent in income tax of petitioners and an addition thereto for the year 1948, as follows: *344 Addition
Name
Deficiency
to Tax
Gabriel & Thelma Leeb
$ 956.50
$108.22
Leighton & Honey Rosen-
thal
4,536.73
Gabriel & Miriam Feigen-
baum
3,778.20
Various adjustments made by respondent in determining the above deficiencies as well as the foregoing addition to tax in the case of petitioners in docket No. 35019 have been acquiesced in by the taxpayers concerned. Petitioners have assigned as error only those adjustments so made in connection with the gains on the sales of certain properties by a partnership composed of the husband petitioners. Thus, the sole issue presented for our consideration is whether such sales gave rise to capital gain or ordinary income. Findings of Fact The stipulation of facts filed by the petitioners is adopted and made a part hereof. The petitioners in docket No. 35019 are Gabriel Leeb and Thelma Leeb, husband and wife, who reside in Cleveland Heights, Ohio. Petitioners in docket No. 35020 are Leighton Rosenthal and Honey Rosenthal, who are husband and wife residing in Shaker Heights, Ohio. The petitioners in docket No. 35038, Gabriel Feigenbaum and Miriam Feigenbaum are husband and wife residing in Shaker Heights, *345 Ohio. All petitioners filed joint income tax returns for the calendar year 1948, the taxable year here involved, with the collector of internal revenue for the eighteenth district of Ohio at Cleveland. The partnership bearing the name of Prentiss Park Co. (hereinafter referred to as "Prentiss Park") was formed by the husband petitioners (for convenience, hereinafter called "petitioners") in June, 1945, for the purpose of acquiring and subdividing a 42 acre tract of land in Cleveland Heights, Ohio, which land had formerly belonged to one Elizabeth Prentiss. Prentiss Park purchased such land in June, 1945, from the National City Bank, trustee of the estate of Elizabeth Prentiss. The National City Bank was, at that time, in the process of liquidating the estate and wanted to sell the 42 acre tract of land in a single transaction. This tract of land, situated at the corner of Mayfield and Yellowstone Roads in the City of Cleveland Heights, Ohio, was bounded on the south by an approximate 1,100 feet frontage on Mayfield Road, and on the east by an approximate 1,400 feet frontage on Yellowstone Road. The northern boundary extended in a straight line between Yellowstone Road and Taylor *346 Road for approximately 1,800 feet. Approximately 1,000 feet of the western boundary ran north from Mayfield Road along the eastern lot line of an adjoining tract of land belonging to one Julia S. Milliken, which western boundary paralleled Taylor Road but was approximately 370 feet east of Taylor Road. The boundary line then continued in a westerly direction along the northern boundary of the Milliken property for approximately 370 feet to Taylor Road and thence in a northwesterly direction along Taylor Road for approximately 530 feet to intersect the northern boundary. Shortly after the purchase of the 42 acre tract of land, an architect was selected by the Prentiss Park partners to be the site planner in subdividing the property. The partners' intention expressed to the architect, as site planner, was to develop the Mayfield Road frontage directly back to its most effective possibility economically and aesthetically. With the consent of the partners, an engineer was engaged to survey and make a topographical map of the 42 acre tract. When this map was completed, it was delivered to the site planner, who thereupon drew a proposed site plan for subdividing the entire 42 acre tract. *347 This proposed site plan was delivered to the engineer, who prepared the topographical map, for the purpose of preparing the final plat therefrom. He raised a question as to the economy of the design and recommended that the subdivision not include that portion of the tract which was later designated as Block A. When the site plan thus proposed was submitted to Prentiss Park, it was rejected by the partners as being economically impractical to include within the subdivision that part later designated as Block A. The result was that the proposed site plan was abandoned insofar as it related to the northwest six acres of the 42 acre tract. These six acres form an irregularly shaped appendage which, in a map prepared in May, 1947, was designated as Block A. At the time Prentiss Park acquired the property, Block A was not improved and was not subdivided into smaller lots. The only plat which was ever accepted by Prentiss Park or approved by the City of Cleveland Heights or placed on the public records of Cuyahoga County was one which was subsequently prepared and which subdivided the remaining 36 acres into residential lots, leaving Block A an unsubdivided tract of land. Not being a part *348 of the 36 acre subdivision, Block A was not included in the contract between Prentiss Park and the City of Cleveland Heights relating to the improvement of the subdivision with streets, sewers and curb connections. Block A was specifically excluded from the deeds establishing use restrictions on the property on the 36 acre subdivision. Prentiss Park never improved Block A with sewers, streets, sidewalks, water mains or curb connections; never made it subject to any use restrictions; never subdivided it; and, except for the preliminary study that was made and rejected, never mapped it for subdivision. A 20 foot pedestrian right-of-way running through Block A and along its northern boundary from the subdivided 36 acres to Taylor Road was made a part of the subdivision. The completed plat of the subdivision was recorded in May, 1947, and in the summer or fall of 1947 the sub-lots therein were listed with two or three real estate brokers. Prentiss Park never advertised Block A for sale, never displayed "For Sale" signs thereon, and never listed it for sale with any broker. The partners planned to hold Block A for investment. They planned to use the profits from the sales of the residential *349 lots in the subdivision to build an apartment house on Block A and then to hold the apartment building for rental purposes, deriving rental income therefrom. At this time, Block A was not zoned for commercial or apartment buildings, and the partners had no assurance of a change in the zoning. They made no application for such change during the period of their ownership thereof. In November 1947 a real estate agent, representing the Bishop of the Cleveland Diocese of the Roman Catholic Church, approached petitioner Leeb with regard to purchasing Block A for the purpose of erecting thereon a school building. After negotiations, Block A was sold to the Diocese on January 30, 1948 for $35,000. The net profit to Prentiss Park on this sale was $22,519. Neither the petitioners nor anyone acting for them solicited the initial offer from the real estate broker acting on behalf of such Diocese. At the time that the 42 acre tract of land was acquired in 1945, there were several structures, a mansion house, several farm buildings, a superintendent's residence and a farm residence, located on that part of the land which was subsequently subdivided. None of these buildings conformed to the contemplated *350 restrictions to be placed on the use of the subdivision. In addition, those buildings, except one of the residences, were so located that they would interfere with the execution of the contemplated improvement of the subdivision. Accordingly, the petitioners intended to tear down those buildings. Prentiss Park tore down the mansion house and the farm buildings in 1945. The superintendent's residence and the farm residence were occupied by tenants under a month-to-month tenancy at the time when the petitioners acquired the property in 1945 and it was impossible legally to raze or remove these two residences without permission from the Cleveland Area Rent Office of the Office of Price Administration. On January 4, 1946, Prentiss Park filed two petitions with the Cleveland Area Rent Office for the purpose of obtaining permission to tear down the two residences. Both of those petitions contained a statement by the petitioners reading as follows: "It is desired to have the subject accommodations vacated for the purpose of razing the same. This is an old farm house located on a tract of land purchased by the petitioners for the purpose of making a housing development. Its existence on *351 the tract will not only interfere with the execution of the improvements for the allotment, but its structural appearance will be at inconsistent variance with the structural design of the other homes proposed to be erected." The petition relating to the residence located on lot 32 of the subdivision contained the additional statement that: "At best, the present structure would have to be radically remodeled to an extent that would necessitate vacation of the premises." On February 26, 1946, permission to raze the two residences was granted by the Cleveland Area Rent Office. This permission required that Prentiss Park wait a period of more than four months before removing the structures. The documents granting such permission contained the following statement: "The purpose for which eviction of the tenant is authorized is for the sole purpose of razing and demolishing the subject unit." The waiting period prescribed in the certificates granting permission to evict the tenants ended July 7, 1946. The tenants have not been evicted and the buildings have not been razed. In the fall of 1947 all of the lots in the subdivision were listed for sale with real estate brokers. In 1948, *352 after petitioners were approached with respect thereto, the two lots and the houses in question were sold to the parties who were occupying the houses as tenants. The sales of the houses were not at any time material solicited by petitioners, or anyone acting in their behalf. The residence structure which was located on sublot 70 of the 36 acre subdivision was sold, together with the underlying land, for an aggregate price of $6,250.00. The aggregate net profit on this sale was $4,112.31 of which amount $616.65 was properly allocable to the sale of the residence structure. The contract of sale between the petitioners and the purchaser required the purchaser to raze and remove the house located on sublot 70 when the construction of Pine Tree Drive began. Since the petitioners have not yet begun the construction of Pine Tree Drive, that house is still standing. Prentiss Park derived rental income from the residence located on sublot No. 70 from the time it was acquired in 1945 continuously to the time it was sold in 1948. The amount of such rental income aggregated $1,562.50. The residence structure located on sublot No. 32 of the 36 acre subdivision was sold, together with the underlying *353 land, for an aggregate price of $9,250.00. The aggregate net profit on this sale was $5,511.81, of which amount $3,660.37 was properly allocable to the sale of the residence structure. The contract of sale between the petitioners and the purchaser required the purchaser to make extensive alterations in the construction and appearance of the structure in order to conform to the restrictions theretofore placed upon the land. These alterations were subsequently made by the purchaser. Prentiss Park derived rental income from the residence located on sublot No. 32 from the time that the residence was acquired in 1945 continuously to the time that it was sold in 1948. The amount of such rental income so received during this period aggregated $1,625.00. In addition we find the following ultimate facts. Block A was property held by petitioners as partners in Prentiss Park for more than six months. It was not stock in trade of Prentiss Park or other property which would properly be included in the inventory of Prentiss Park if on hand at the close of 1948, nor was it property held by Prentiss Park primarily for sale to customers in the ordinary course of its trade or business. At the *354 time of sale the two residence structures were properties held by petitioners, as partners in Prentiss Park, primarily for sale to customers in the ordinary course of trade or business. Opinion VAN FOSSAN, Judge: We are here called upon to determine the proper treatment to be accorded the gains derived during the taxable year by petitioners from the sales of the six acre tract of land designated as Block A and the two residence structures located on other lots. Respondent has determined that such properties were, at the time they were sold, held by petitioners as partners in Prentiss Park, primarily for sale to customers in the ordinary course of trade or business. He would, therefore, tax the gains realized from the sales thereof as ordinary income under Section 22(a) of the Internal Revenue Code. [1]
*355 Petitioners take the position that the properties in question were not so held; that they were capital assets within the meaning of Section 117(a)(1) of the Code [2], or, in the alternative were properties used in trade or business within the purview of the Code, Section 117(j)(1); [3] and that, therefore, in either event, the gains derived from the sales thereof are taxable as long term capital gains. *356 Whether, at the time of sale, property is a capital asset held by a taxpayer for investment or speculation purposes or is property held primarily for sale in the ordinary course of trade or business is entirely a question of fact. Various aspects of the same question have been considered in numerous cases. See Pacific Affiliate, Inc., 19 T.C. 245 (November 14, 1952); M. A. Paul, 18 T.C. 601; Susan P. Emery, 17 T.C. 308; Thomas E. Wood, 16 T.C. 213; C. E. Mauldin, 16 T.C. 698; W. T. Thrift, Sr., 15 T.C. 366; Nelson A. Farry, 13 T.C. 8; Carl Marks & Co., 12 T.C. 1196; and Thompson Lumber Co., 43 B.T.A. 726. But, since each case must be decided on its own peculiar facts, Higgins v. Commissioner 312 U.S. 212; no useful purpose is to be served by prolonging this opinion with an extended discussion of the diverse factual situations involved in those various cases. Suffice it to say that from the many cases posing the question, there have evolved a number of well recognized criteria, such as the continuity of sales or sales-related activity over a period of time; *357 the frequency of sales; the number and substantiality thereof; the activities of the vendor or agents acting in his behalf or under his instructions with regard to the time, labor, or amounts expended to attract purchasers through advertising and by improvements; and the reason for, purpose, or nature of the acquisition of the subject matter. W. T. Thrift, supra; Boomhower v. United States, 74 Fed. Supp. 997. In the instant case, the six acre tract of land here designated as Block A, was acquired by a partnership, of which petitioners were members, as a part of a larger 42 acre tract located near the corner of Mayfield and Taylor Roads in the City of Cleveland Heights, Ohio. The partnership had been formed by petitioners for the express purpose of acquiring such property, and developing a part, if not all, of it as a residential subdivision. Subsequent to the acquisition thereof, petitioners engaged as site planner an architect who was given instructions to develop the tract from its Mayfield Road frontage directly back to its most effective possibility economically and aesthetically. After certain preliminary studies were completed, the architect drafted *358 a proposed site plan for subdividing the entire tract. When the site plan thus proposed was submitted to the petitioners, it was rejected by them as being economically impractical to attempt the development of Block A as part of the contemplated subdivision. Petitioners thereafter proceeded to subdivide the remaining 36 acres into residential lots which have been and are being held for sale and sold to the public. These lots, insofar as the land itself is concerned, are not in controversy here. As for Block A, any plans that may have existed with regard to subdividing it were abandoned. No portion of it was ever rented and there seems to have been little or no activity with regard thereto during the remainder of the time it was owned by the petitioners. It does not appear to have been put to any use whatever during this period. In fact, for aught the record shows, Block A was simply held by petitioners as a plot of unimproved and undeveloped land with no particular plans for its immediate use. For these reasons, we think that petitioners' argument based upon Section 117(j), supra, insofar as that argument relates to Block A, is inappropriate. Section 117(j) was added to the Code *359 in 1942 as a relief provision by virtue of which gains derived from the sale or exchange of certain types of property used in a taxpayer's trade or business and held for more than six months are to be treated and taxed as long range capital gains. It is to be strictly construed and limited to those transactions coming within its express provisions. The definition of the term "property used in trade or business" as used therein includes real property held for more than six months and used in the taxpayer's trade or business. Section 117(j)(1), I.R.C. In ordinary parlance, the word "used" means actively employed or a state of being so employed. Thus, it connotes some form of activity. The term "business" as used in the statute "* * * notwithstanding disguise in spelling and pronunciation, means business * * *." Snell v. Commissioner, 97 Fed. (2d) 891. In our opinion, Block A cannot be said to come within the concept of "real property used in the trade or business" of petitioners without distortion of that statutory term. Hence, the provisions of Section 117(j) would appear to be wholly inapplicable here insofar as Block A is concerned. As pointed *360 out above, the land in question was purchased as part of a larger tract of land all of which petitioners admit they bought for the primary purpose of subdivision and resale to customers in the ordinary course of business. Had the preliminary studies shown it to be economically feasible to subdivide and develop the entire 42 acres, there is no doubt that such would have been done and the land comprising Block A, along with the remainder of the tract, held for sale to customers in the ordinary course of petitioners' business of developing and selling residential lots therein. But the initial purpose for which property is acquired and held is not conclusive. The determining factor is the purpose for which such property is held at the time a sale thereof is consummated. Thus, property originally purchased and held for sale to customers in the ordinary course of a taxpayer's business as a dealer may subsequently be converted into a capital asset as property held for investment and/or speculation purposes of the taxpayer. See Pacific Affiliate, Inc., supra; Carl Marks & Co., supra.In determining whether such conversion actually in fact was effected, consideration *361 must be given to all material facts, the inferences and conclusions fairly to be drawn therefrom. We find from the evidence that following the abandonment of any plan which may have existed to include Block A in the subdivision subsequently developed, no effort at all was made to sell Block A. No sales were solicited. Nor was Block A ever advertised for sale. No "For Sale" signs were ever displayed thereon and the tract of land was never listed with any real estate broker. Block A was never subdivided. Nor were any improvements made thereon. It was never made subject to the use restrictions imposed upon the 36 acre subdivision. In fact, it was expressly excluded therefrom by the deeds establishing such restrictions. The only portion of the tract made part of the subdivision was a 20 foot pedestrian right-of-way connecting such subdivision with Taylor Road. The petitioners have shown by uncontradicted evidence that after acquisition they held Block A for future use as a site for an apartment development later to be erected by them with the profits derived from the sales of the subdivided lots, and which apartment property was thereafter to be held by them as a rental income producing *362 investment. In sum, the facts adduced and the application of the well recognized tests set out above lead us to the conclusion that, at the time of its sale, Block A was not held by petitioners primarily for sale to customers in the ordinary course of trade or business, but was held as an investment and was accordingly a capital asset within the meaning of section 117(a), supra. Respondent's determination to the contrary is reversed. The sales of the two residence structures in dispute present a somewhat different aspect of the question under discussion above. Both houses in controversy are located on two of the lots within the 36 acre subdivision referred to above. The parties agree that all of the lots in the subdivision, excepting Block A, were held primarily for sale to customers and that the gains derived from the sale of the land underlying these two houses constitute ordinary income. They disagree, however, as to the status of the gain allocable to the houses, whether capital gain or ordinary income. We are unable to find merit in the argument that the houses are here severable from the land and should be given a different treatment. We have said the final test is how *363 was the property held at the time of sale. Here the houses and the underlying land were sold in the usual manner, as houses and lots are sold every day. Admittedly, the underlying land was held primarily for sale to customers in the ordinary course of business. In our judgment, the houses when sold had the same character as the land on which they stood. This was true regardless of how they may have been considered at some previous time or of the fact that the owner at one time contemplated razing them. Petitioners, on whom the burden of proof rests, have not proved otherwise. It follows that the profit so made when both of the houses and the two lots on which they stood were sold is taxable as ordinary income. Decisions will be entered under Rule 50. Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *↩
2. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or real property used in his trade or business; * * *↩
3. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, or a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩